**Robert MacNeill**
4905 34th Street South, #3500
St Petersburg, FL 33711

June 14, 2005

Mr. William P. Breen, Jr., Esq.
World Trade Center East
Two Seaport Lane
Boston, MA 02210

RE: Zhanna Chizhik v. Sea Hunt, Inc.

Dear Mr, Breen,

Per your request, I prepared a report of my findings concerning the above referenced matter. The report follows.

Accident Scenario
On May 25, 2003, Mr. Greg Zilberman trailered his Sea Hunt Navigator 22 boat to a launch ramp at Weymouth Landing on the south shore of Hingham Bay, near Boston Harbor. His intentions were to go fishing with Mr. Amir Lashgari and Mr. Grigory Chizhik. They launched the boat and proceeded to a point along the south shore of Outer Brewster Island. According to the Coast Guard, there were three foot seas and a ten knot wind out of the northeast. Mr. Zilberman stopped the boat, and allowed it to drift, beam to the swells while he left the helm, faced the island with his back to the sea, and cast into the surf. Apparently all three people on board were focused on the fishing and had their backs to the sea. At approximately one o'clock, Mr. Lashgari turned to speak to Mr. Chizhik and saw a large wave of approximately eight or nine feet in height approaching the boat from the starboard beam. The wave capsized the boat. After the capsize, the boat floated upside down and level with Mr. Lashgari floating in the air pocket under the boat. The two others were outside the boat and were able to hold onto the gunwales. Mr. Lashgari swam out from under the boat and joined the others. Approximately ten minutes after the boat capsized, Mr. Chizhik died. Mr. Zilberman and Mr. Lashgari wedged Mr. Chizhik's body between the lower unit of the outboard motor and the transom and climbed up onto the hull of the overturned boat. According to Mr. Lashgari, the surf was too strong to attempt to swim ashore. His words were, "I wouldn't have jumped in cause I would have gone smashing into the rocks." Approximately two hours later, they were spotted by someone on a passing boat and were rescued.

Materials Reviewed
1. Complaint, Case Number: 04-10106JLT, January 16, 2004.
2. Transcribed statement of Amir Lashgari.
3. Small scale chart of Boston Harbor.
4. Coast Guard Release number 041-03
5. Coast Guard Release number 042-03
6. Coast Guard time line outline of accident, 2 pages.
7. Coast Guard hand written time line outline of accident, 2 pages.
8. Marine casualty or accident notification list, 5 pages.
9. SAR check sheet.
10. Coast Guard Group Boston Case Log/chrono sheet, 2 pages.
11. Coast Guard Incident Report Folder, 4 pages.
12. Coast Guard, Pt. Allerton, Person in Water Report, 2 pages.
13. Coast Guard Group Boston Radio Log and notes, 10 pages.
14. Report of Kenneth W. Fisher
15. Deposition of Victor O. Roof
16. Boston Harbor Chart, Number 13270
17. Sea Hunt catalog, competitor's catalogs.

Inspections and Tests
1. May 24, 2005, Inspected Sea Hunt Manufacturing facilities. Met with Victor Roof, and Douglas Collier.

Discussion
   The hull bottom surface configuration of the Sea Hunt Navigator 22 is a proven design that has been in existence for at least 25 years. Tens of thousands of boats have been built to the same basic hull bottom surface shape. Boats built with similar hull bottom configurations have the reputation for being safe, seaworthy, sea kindly, and predictable.

   The planning surface of the Sea Hunt Navigator 22 has a deadrise angle of fifteen degrees. The deadrise angle is the primary indicator of the ability of a powerboat to travel at planning speeds in rough water. Planing hulled powerboats designed for sheltered waters are typically built with a deadrise angle between zero and ten degrees. Powerboats designed to travel at planning speeds in rough offshore waters will typically be designed with deadrise angles from twenty to twenty-four degrees.

   The fifteen degree deadrise chosen for the Sea Hunt Navigator is an excellent bridge between the two extremes. Compared to the sheltered water boat, the Navigator 22 will have a softer ride in choppy waters, will have better directional control in turns, and will have a slightly deeper draft. Compared a boat designed for offshore use, the Navigator 22 will pound more in rough water, but will have better initial stability, and will draw less water. These characteristics make the Navigator 22 suitable for use on any

2

inland body of water as well as for open coastal waters. As with any recreational vessel, weather and water conditions must be taken into account before venturing into open waters.

Sea Hunt boats including the Navigator 22 utilize the open molding process for all fiberglass parts and are constructed using state of the art materials. During my tour of the Sea Hunt facility, I noted a better than average fit and finish to all components as well as a better than average quality of installed components. Foam floatation was installed in the Navigator 22 even though the Coast Guard does not require floatation in boats over 20 feet.

Mr. Lashari made no mention of any water entering the boat prior to the accident; therefore, we must assume that there was no free water inside the boat prior to the accident. According to Mr. Lashgari, the boat was adrift, beam to the sea, moving up and down in a three foot sea. A rogue wave, reported to be eight to nine feet tall hit the boat on the starboard beam and caused the boat to capsize. The boat did not sink, but floated upside down, supported by the foam floatation installed by Sea Hunt. The occupants, not wearing PFD's, were able to use the boat for floatation. The fact that the boat continued to float after being capsized, even though the Coast Guard did not require it to do so, probably saved the lives of the two survivors.

Per the Coast Guard's release number 042-03, the wave heights were three feet. Three foot ocean swells are tolerable for a small boat depending on the wave length as well as the speed and direction of the boat. However, a three foot coastal chop will produce a very uncomfortable and wet ride at any speed in a small open boat. When three foot ocean swells encounter a rocky coast line or beach, waves are produced that would make swimming in the surf a dangerous activity. Having no other information, I assume that the three foot wave heights were measured in the open ocean somewhere off the coast near Boston. Mr. Lasgari's statement indicating that the surf was too rough for him to attempt to swim ashore after the accident, support the Coast Guard's report of three foot seas.

Larger than average ocean waves are normal and occur frequently. They typically occur as a result of two series of waves traveling at two different speeds. When the faster waves overtake the slower waves, the wave heights can become additive. In that situation, the mariner can expect an abnormally large wave to occur with some frequency. Mr. Lashgari noted that a ferry boat had passed minutes before the accident. The ferry boat's wake formed a wave pattern that could have combined with the ocean wave patterns to form an unusually high wave.

The point at which swells turn into breaking waves is dependant on the water depth. Larger swells will begin to break in deeper water than will smaller swells. The boat was apparently drifting, beam to the seas, in a three foot swell, to seaward of the point at which a three foot swell would begin to break into a wave. It is entirely possible that an eight foot swell may have begun to break to seaward of their boat. The forward

3

face of a swell will become steeper before it breaks. As the wave breaks, its mid point becomes approximately vertical, and the water at the crest accelerates, forming the curl.

The type of boat, inshore, offshore, or anything in-between, would have made no difference in this accident. Any boat with a beam of approximately eight feet would have capsized in the rogue wave as described by Mr. Lashgari. An eight to nine foot wave would have heeled the boat to almost ninety degrees. Inertia plus the energy in the wave crest would have completed the capsize. Boat hull configuration would have had no bearing on the outcome. Higher topsides would have had no bearing on the outcome.

Boats built specifically for open ocean fishing generally have higher topsides forward because they are expected to be used consistently in rough water. Higher topsides forward help keep water out of the boat when punching into the seas. Higher topsides aft help hold people inside the boat while fighting a fish in rough water. The height of the topsides had no bearing on the outcome of this accident.

It is highly probable that the subject boat could have maneuvered through the rogue wave if it could have taken the wave head on. The wave might have broken over the bow, putting water into the cockpit, but because the cockpit is self bailing, the water would have drained overboard.

Mr. Zilberman, the owner and operator of the subject Sea Hunt Navigator 22 placed the boat and its occupants in peril by allowing the boat to be adrift, beam to the seas, in an area close to the dangerous surf and close to a rocky lee shore. Per Mr. Lashgari's statement, he abandoned the helm, was not in command of his vessel, did not appoint someone to be in command, and focused his attention on casting into the surf.

Opinions
1. The design of the Sea Hunt Navigator 22, including the hull bottom shape and the freeboard, is designed similar to tens of thousands of boats and is not defective or unreasonably dangerous.

2. The Sea Hunt Navigator was manufactured to quality standards equal to or better than those of its competitors.

3. The boat's bottom configuration had no bearing on the outcome. Any similar sized boat would have capsized in the same circumstance.

4. The boat's freeboard configuration had no bearing on the outcome. Any similar sized boat would have capsized in the same circumstance.

5. There was no significant amount of water in the cockpit and no indication of any water in the bilge, therefore, free water inside the boat had no bearing on the outcome.

6. The accident happened because the owner placed the boat and its occupants in a high risk situation by leaving the helm with no one in command of the vessel.

7. A rogue wave, not seen by the owner who had focused his attention on fishing to leeward, hit the boat on the starboard beam and caused it to capsize.

8. If a person would have been at the helm and in command, the large approaching swell could have been noticed in time to turn the boat into the sea and, thus avoid the accident.

9. Warnings are not an issue in this case for the following reasons:
   - The boat was not defective; therefore, warnings for alleged defects were not required and not appropriate.
   - A boat manufacturer cannot warn against all of the perilous situations in which an owner may place his boat and his passengers.
   - A boat manufacturer cannot warn against a rogue wave.

The above opinions are based on information received to date. I reserve the right to alter or expand my opinions based on information obtained in the future.

Sincerely,

Robert MacNeill